IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISON

| | |
|---|---|
| KEITH M. GRUBAUGH, | ) CASE NO. 5:20-CV-00272-SL |
| | ) |
| Plaintiff, | ) JUDGE SARA LIOI |
| | ) United States District Judge |
| v. | ) |
| | ) MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) CARMEN E. HENDERSON |
| | ) |
| | ) REPORT AND RECOMMENDATION |
| Defendant, | ) |

**I. Introduction**

Plaintiff, Keith M. Grubaugh ("Grubaugh" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court REVERSE the Commissioner of Social Security's nondisability finding and REMAND this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**II. Procedural History**

On December 30, 2016, Claimant filed an application for SSI, alleging a disability onset date of November 26, 2016. The application was denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). (ECF No. 11 at 174). On October 25, 2018, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 11 at 99-129). On December 18, 2018, the ALJ issued a written decision finding Claimant was not disabled. (ECF No. 11 at 14). The ALJ's

1

decision became final on December 13, 2019, when the Appeals Council declined further review. (ECF No. 11 at 5).

On February 7, 2020, Claimant filed his Complaint to challenge the Commissioner's final decision. (ECF No. 1.) The parties have completed briefing in this case. (ECF Nos. 13, 17, 18). Claimant asserts the following assignments of error:

> 1. The ALJ committed harmful error when he did not meet his burden at Step Five of the Sequential Evaluation.
>
> 2. The ALJ erred when he failed to properly evaluate the evidence in this matter.
>
> 3. The ALJ's determination regarding credibility was in error and was not supported by substantial evidence as required by Social Security Ruling 16-3p.

(ECF No. 13 at 1).

## III. Background

Claimant was born on April 5, 1982 and was a younger individual at all relevant times. He attended school until the ninth grade in special education and did not have a GED. (ECF No. 11 at 106).

### A. Relevant Medical Evidence

The ALJ summarized Claimant's health records and symptoms:

> Between November 25, 2016 and December 8, 2016, the claimant was hospitalized following a motor vehicle collision. The claimant was found to have right pneumothorax, right fourth through sixth rib fractures, left tenth rib fracture, and bilateral pelvic fractures (3F/l 15, 118, 120, 123. During the course of his stay, the claimant underwent a closed reduction of the left hip dislocation with femoral head fracture, open reduction and internal fixation of the right transverse posterior wall acetabular fracture, open treatment of the left acetabular fracture, left femoral head fracture with fixation of the posterior wall, excision and removal of bone fragments of the left hip joint, and open reduction and internal fixation of the left ulnar fracture (3F/53-65). The claimant was discharged to Bath Manor Special Care Center where he underwent skilled nursing care, which included goals to increase his ability to manage meal

preparation, self-care and mobility (4F/50-52). The record showed ongoing wound care with healing of incision lines (4F/12). Physical therapy notes indicated that the claimant was nonambulatory upon admission and experienced decreased cognitive and linguistic skills (5F/47).

In January 2017, the claimant sought follow up treatment following discharge from Bath manor. He presented with complaints of chronic pain and was prescribed OxyContin and Percocet (6F/4). However, the claimant was noted to overuse medications and offered excuses for his misuse of opioids. Colin Moorhead, M.D., wrote that the claimant should be referred for a proper psychological evaluation (6F/4-5). On February 15, 2017, treatment notes indicated difficulty obtaining pain management due to a pas [sic] history of Adderall possession (6F/l). The claimant started on an opioid weaning regimen (6F/2). By March 10, 2017, the claimant was noted to be doing well overall with ongoing home rehab and foot drop. Examination showed well-healed incisions. The claimant had no restrictions in the upper left extremity. The claimant was told to begin weight bearing progressing 20 pounds per week until full weight bearing (7F/l).

Treatment notes through the remainder of 2017 showed some complaints of falls in the latter part of the year. However, the claimant reported activities such as apple picking (11F/1). Examination showed decreased range of motion and decreased strength and tenderness in the right hip. He had tenderness with normal range of motion in the right knee (11F/5). His gait was noted to be antalgic (11F/6). Examination of the spine was unremarkable (13F/4). Medications were limited to Gabapentin, Mobic, and Voltaren for pain (11F/6 and 13F/3).

The claimant underwent X-rays of the cervical spine in December 2017, which showed postsurgical changes but also postural abnormalities that were secondary to either joint dysfunction and/or muscle spasms (14F/5). The claimant was prescribed orthotic devices in the lower extremities in late 2017, which improved his ambulation and pain (18F). However, it is noteworthy that these studies were read by a chiropractor, which is not considered an acceptable medical source. The record shows that the claimant continued to undergo chiropractic treatment into early 2018 (14F). At the same time, he complained of pain in his lower extremities which would flare up from time-to-time. He reported some difficulty getting in and out of bed without assistance (16F/l). Examination showed antalgic gait without support (16F/2). However, the record lacks evidence of significant changes in treatment or new diagnoses.

3

With regard to the claimant's mental impairments, the claimant has a history of special education placement with IQ scores in the borderline range.  For instance, education records in 1990 indicated that despite failing the first grade, the claimant continued to fail during his second year (lF/3).  In December 1995, the claimant underwent the Wechsler Intelligence Scale for Children- Third Edition which showed a verbal score of 76, a performance score of 84, and a full scale score of 81 (lF/7). Earlier testing showed a verbal score of 85, performance score of 84, and full scale IQ of 84 (lF/22).

On December 16, 2016, around the time of the protected filing date, the claimant was discharged from Portage Path Behavioral Health after he missed too many medication management appointments and did not want to wait for a walk-in appoint. The claimant presented with average activity, adequately groomed appearance, average eye contact, and clear speech. He had full affect, cooperative behavior, and anxious mood. He was oriented to person, place, time and situation.  He had fair insight and poor judgment but had logical thoughts (2F).

The claimant underwent a consultative examination for the State Agency with Joshua Magleby, Ph.D., on March 14, 2017.  The claimant reported that he dropped out of school in the 9th grade and stated that he could not read or write.  He stated that he last worked as a mechanic, but stopped working because of his accident. He denied issues interacting with coworkers or supervisors. He reported depression, difficulty focusing and concentrating, but denied homicidal or suicidal ideation and no symptoms of mania, delusions, or psychosis. Mental status examination showed that the claimant was alert and oriented to person, place, time and situation. He was linear, future oriented, and without loosening of thoughts.  He had normal word finding and articulation, and his rate of speech was normal.  His ability to understand complex directions and language was good.  He was somewhat restricted in affect and had mood congruent affect. He had some signs of depression, but had "fairly stable" mood.  He did not have overt signs of anxiety.  He had difficulty with spelling, serial sevens and some limitation in recall. He had poor general knowledge and appeared to have borderline or extremely low intelligence.  He was diagnosed with attention deficit hyperactivity disorder, adjustment disorder, and borderline intellectual functioning (9F).

The record shows that the claimant began treatment at Portage Path Behavioral Health in May 2017 after an earlier discharge in late 2016.  On May 3, 2017, he presented with complaints that he was

4

off his medication and was disorganized. He stated that he had issues with anxiety and panic (12F/27). Mental status examination showed agitated activity, rapid speech, and racing thoughts. He was alert and oriented to person, place, time and situation (12F/30). Later in May, the claimant left during a visit when he became angry for a request for records. He was noted to be angry (12F/25). On May 23, 2017, the claimant presented with reports that he was attempting to obtain his GED. However, he stated that he read at a third-grade level. The claimant was started on Adderall medication (12F/19). Subsequent treatment notes in June 2017 indicated improvement in symptoms of attention deficit hyperactivity disorder with medication (12F/15). Indeed treatment notes through the end of 2017 showed stabilization of mood with low anxiety and low depression. However, the claimant continued to receive some increases in medication to help with afternoon symptoms (12F/2). In November 2017, the claimant presented with average eye contact, clear speech, logical thoughts and fair insight and judgment. He was alert and oriented to person, place, time and situation. He had normal and intact memory and appropriate mood with mild anxiety and depression (12F/3).

Treatment notes in 2018 showed stabilization of the claimant's mental health symptoms with treatment. For instance, in January 2018, he reported improvement in concentration and focus, stable appetite, and adequate sleep. Mental status examination findings include good insight and judgment, full orientation to person, place, time and situation, good attention and concentration, and appropriate affect with euthymic mood (l5F/6-7). The claimant continued to present with similar findings throughout the year (e.g., l5F/16-17, 21-22).

(ECF No. 11 at 23-25).

### B. Relevant Hearing Testimony

#### 1. Claimant's testimony[1]

The ALJ questioned Claimant about his use of ambulatory aids:

> Q   Okay. Are you using any kind of a cane or anything like that?
>
> A  It all depends. If it gets real bad, I use a cane.

---

[1] The Court has included only the testimony relevant to Claimant's use of ambulatory aides since it has determined remand is necessary on that basis.

Q    On a bad day?

A  Yeah, yeah.

Q  What was it

A  The wintertime it's -- it's the worst, when it's cold outside.  When it rains, I can't even really walk.

Q    Is today a good day, weather wise, for you?

A  No, not too bad.

Q    Okay, today's like 50 degrees or so, and kind of dry.  When was the last time you used the cane?

A  Last night.

Q  Where were you when you were using it?

A  My mom's house.

Q  At your parent's house?

A  At home, yeah.  I had to get up to get some water.

Q  Why were you using it?  What happened?

A  I was -- because when I -- when I -- when I sit down, when I go to get up, I always have to have something to -- I don't know what's -- what's going to happen.  If -- if -- if I usually like kind of go to the ground, so I got to catch myself.  So, I just keep the cane by me all the time.

Q  Okay.

A  Because I'm not sure what --

Q    Okay.  Before that, before last night, when was the last time you used it?

A  The night before that too.

Q    Okay.

A  Last -- last week has been -- been pretty bad because of the

6

weather change.

Q All right, how about in the morning? Do you need it in the morning?

A That's -- that's the worst, yeah. When I first – first get up. It takes me like -- like an hour or two before like I can actually start walking decent. My decent anyway.

Q Right. It sounds like you use it every day?

A Pretty much, but I like you know when it's the summertime and like it was real hot out, it wasn't as as bad, but like in the mornings, like when I first get up, it was like one of those hold onto the -- hold onto the, you know, my dresser or hold onto the door knob and --

Q Okay.

A You know, grab stuff as I walk.

(ECF No. 11 at 112-114).

Q Are you wearing any kind of brace right now?

A .I can't, due to my foot swelling up.

(ECF No. 11 at 115).

Q All right. When was the last time you wore the ankle brace?

A A few days ago.

Q Okay. How often do you think you wear it?

A Oh, I -- I wear it all the time. It's just -- because of how how it works, it goes up underneath the shoe, and then it goes around. Well, it goes around your ankle. Well, if your ankle is swelled up, you can't -- you can't put that on.

(ECF No. 11 at 116-117).

### 2. Vocational Expert testimony

During the hearing the ALJ asked the vocational expert a series of hypothetical situations. For the first hypothetical, the ALJ asked the vocational expert to

7

> [a]ssume a hypothetical individual of the claimant's age and education, with the past jobs you described. Further assume this individual is limited to light work, with the following additional limitations. Occasional ramps and stairs, no ladders, ropes or scaffolds. Occasional balance stoop, kneel and crouch. No crawling. No unprotected heights, moving mechanical parts, or operating a motor vehicle. Simple routine tasks, but not at a production rate pace. Simple work related decisions. Occasional interaction with supervisors, coworkers and the public. Few changes in a routine work setting.

(ECF No. 11 at 126). Ultimately, the ALJ determined that Claimant was limited to a sedentary level of exertion, which was considered in his second hypothetical to the vocational expert: "[t]he second hypothetical, same hypothetical individual, same limitations as before, but this person is at the sedentary level of exertion." (ECF No. 11 at 127). The vocational expert testified that there would be significant jobs available for such a person regardless as to whether the person required the assistance of a cane. (ECF No. 11 at 127-128).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

2.  The claimant has the following severe impairments: status post open reduction internal fixation of the lower extremity, status post bilateral hip fractures and rib fractures, osteoarthritis, drop foot, peripheral neuropathy, attention deficit hyperactivity disorder, depressive disorder, anxiety disorder, and borderline intellectual functioning (20 CFR 416.920(C)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except he can climb ramps and stairs occasionally, but never climb ladders, ropes or scaffolds. He can occasionally balance, stoop, kneel, crouch, but never crawl. He can never work at unprotected heights, never around moving mechanical parts, and never operate a motor vehicle. He is limited to simple, routine tasks, but not at a production rate pace. His is able to perform simple work-related decisions. He can have occasionally [sic] interaction with coworkers and

8

supervisors, and the public. He is able to tolerate few changes in a routine work setting.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since December 13, 2016, the date the application was filed (20 CFR 416.920(g)).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance

benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

Claimant raises three issues on appeal: 1. whether the ALJ erred at step three of the sequential analysis by failing to properly evaluate the evidence in this matter when he determined that Claimant did not meet a listing; 2. whether the ALJ's credibility determination is supported by substantial evidence as required by Social Security Ruling 16-3p; and 3) whether the ALJ met his burden at step five of the sequential evaluation. The Court agrees with Claimant that remand is necessary due to the ALJ's error at step three of the sequential analysis.

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x. 488, 491 (6th

Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). In other words, a claimant who meets the requirements of a listed impairment will be deemed conclusively disabled and entitled to benefits.

Claimant asserts the ALJ failed to sufficiently evaluate the medical evidence regarding his ability to ambulate effectively and use of an ambulatory aid when evaluating Listing 1.06 and failed entirely to evaluate whether Claimant met the requirements of Listing 1.03. (ECF No. 13 at 14). The Commissioner does not dispute that the ALJ does not mention Listing 1.03 but argues, without citation to the record, that "substantial evidence supports the ALJ's finding that Claimant's impairments did not meet or equal any listed impairment, including Listing 1.03." (ECF No. 17 at 16). The Commissioner also argues that Claimant failed to demonstrate that he is unable to ambulate effectively as defined in 1.00B2b.

A claimant meets Listing 1.03 when he demonstrates, following "reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, [the] inability to ambulate effectively, as defined in 1.00B2b, and [that a] return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. Pt. 404 Subpt. P App. 1 § 1.03. Here, the ALJ did not mention Listing 1.03. He did, however, address Listing 1.06, which requires a claimant to demonstrate that following fracture of the femur, tibia, pelvis, or one or more of the tarsal bones that "[s]olid union not evident on appropriate medically acceptable imaging and not clinically solid" and the "[i]nability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset." 20 C.F.R. Pt. 404 Subpt. P App. 1 § 1.06. Both Listing 1.03 and Listing 1.06 require a claimant to show the inability

11

to ambulate effectively, and that the return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset. According to section 1.00B2b, to ambulate effectively, individuals must:

> be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404 Subpt. P App. 1 § 1.00B2b.

The ALJ found that Claimant did not meet Listing 1.06 because "despite multiple fractures involving the lower extremities and osteoarthritis, the claimant is able to ambulate effectively and does not use an assistive device to ambulate despite an antalgic gait (11F/6; 13F/3 and 16F/2)." (ECF No. 11 at 19). The ALJ's discussion of the Listing and evidence is not sufficient such that meaningful judicial review is possible.

In support of his conclusion, the ALJ cites to three medical records: 11F at page 6, 13F at page 3, and 16F at page 2. However, these pages do not support the ALJ's conclusion. Exhibit 11F at page 6 indicates that Claimant suffers from "antalgic gait" without mention of an ambulatory device; Exhibit 13F at page 3 makes no reference to Claimant's gait at all, whereas page 4 references only "antalgic gait" with no reference to an ambulatory device; and Exhibit 16F at page 2 states that Claimant suffers from "antalgic gait [without] support". (*See* ECF No. 11 at 653, 720, 721, and 786). The ALJ does not address Claimant's struggles with ambulation and the medical

12

records he relied upon do not provide the intended support. Accordingly, the ALJ's explanation for his conclusion that Claimant is able to ambulate effectively without an assistive device is not sufficient.

Moreover, reviewing the decision as a whole does not provide sufficient support for the ALJ's conclusion. Under the regulations, the inability to ambulate effectively means "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1.00B2b1. Regulations 1.00J2 and 4 discuss a claimant's use of orthotic and hand-held assistive devices (such as a cane, crutch, or walker) and how a claimant with an impairment of his lower extremities should be examined.

Here, the ALJ failed to properly parse the record an omitted any mention of Claimant's use of a wheelchair, walker, or cane during his period of disability despite the records indicating their use. (*See e.g.* ECF No. 11 at 594, 596, 597, 602, 799). Although the ALJ mentions Claimant's use of a crutch, he merely cites it as a fact, but does no further analysis. (ECF No. 11 at 23). The ALJ fails to mention Claimant's use of a cane despite Claimant testifying to using one daily. (ECF No. 11 at 114). Additionally, although the ALJ mentions Claimant's orthotics twice, he fails to accurately reflect the contents of the medical records he cites. The first reference cites to Exhibit 18F for support that the orthosis "improved his ambulation and pain." (ECF No. 11 at 23). Exhibit 18F consists of progress notes from Yankee Bionics from November 16, 2017 through December 15, 2017. On November 16, 2017, Claimant was assessed for the need of a custom orthosis due to

his drop foot on his left side. It was determined that a custom orthosis was necessary due to: A) Claimant's condition presented with abnormal anatomical shape, alignment, or size of foot and or ankle that would preclude the use of a prefabricated ankle foot orthosis; B) the condition the orthosis is being use for is expected to be permanent or longstanding; and C) control of the foot and ankle in more than one plane is required to treat the condition. (ECF No. 11 at 811). Claimant received the custom orthosis on December 15, 2017. (ECF No. 11 at 815). It is true that at the fitting of the device, Claimant reported that he walked with less pain in his ankle (ECF No. 11 at 816), but the record does not indicate that it improved his mobility – only that improved mobility was a goal (ECF No. 11 at 817). The second reference to the orthosis states that Claimant "has used an orthotics for pain" but again states without any support that he is able to ambulate without an assistive device. (ECF No. 11 at 25).

The ALJ's decision paints the picture of a man who, following a car accident, which led to multiple corrective surgeries, was able to ambulate without assistance relatively quickly. The ALJ ignores or misstates nearly two years of medical records demonstrating Claimant's reliance on assistive devices: from a wheelchair, to a walker, to a cane, and with the extra assistance of an orthosis for his left foot drop and a hospital bed to sleep in at night. The ALJ does not explain his conclusion that Claimant could ambulate effectively under the regulations. The ALJ fails to actually evaluate the evidence and compare the facts to the requirements of the listing and instead gave a single-sentence summary conclusion that is factually incorrect – i.e. that Claimant does not use an assistive device Because the ALJ fails to adequately explain his conclusion, and because it is factually incorrect, no meaningful review can be accomplished. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). Without the ability to "facilitate meaningful judicial review", "it is impossible to say that the ALJ's decision at Step Three was supported by substantial

evidence." *Id*. (citations omitted). Because "there is no way to review the ALJ's hopelessly inadequate step three ruling," this matter should be remanded "for a discussion of the evidence and an explanation of reasoning supporting" the ALJ's determination. *Id.*

The ALJ's error was not harmless. The regulations indicate that "if a person is found to meet a Listed Impairment, they are disabled within the meaning of the regulations and are entitled to benefits; no more analysis is necessary." *Id.* (citing 20 C.F.R. § 404.1520(a)(4)(iii)). Therefore, if the ALJ had properly analyzed step three, and had found Claimant met Listing 1.06 or 1.03, he would receive benefits regardless of what the ALJ's conclusion would have been at steps four or five.

Additionally, in this case, correction of such an error is not merely a formalistic matter of procedure, for, despite the Commissioner's assertion, it is possible that the evidence Claimant put forth could meet Listing 1.06 or 1.03.

For example, the ALJ determined that Claimant could ambulate effectively "and does not use an assistive device to ambulate". (ECF No. 11 at 19). The ALJ said nothing of the first requirement for Listing 1.06 ("[s]olid union not evident on appropriate medically acceptable imaging and not clinically solid"), so we cannot say that Claimant would have failed to meet the listing regardless. The record as a whole indicates that Claimant was required to use an ambulatory aid for at least 12 months following the accident; first a wheelchair, then a walker, then a crutch and/or cane. The Commissioner argues that Claimant's did not prove that he is unable ambulate effectively as defined by 1.00B2b. However, 1.00B2b states that a person can ambulate effectively if he can "sustain[] a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.00B2b. The

15

regulation then provides a *non-exhaustive* list of examples of a person who cannot ambulate effectively. And finally, the regulation cautions that even a person's ability "to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.00B2b.

Contrary to the Commissioner's argument that Claimant relies only on his testimony that he requires the use of an assistive device (and required one for more than 12 months), Claimant has provided medical evidence of his need for an assistive device. Upon his discharge following his numerous surgeries, Claimant required the use of a wheelchair for a period of time. (*See e.g.* ECF No. 11 at 597, 602). In January 2017, Dr. Travis Jones at Akron General Orthopaedic Surgery Clinic prescribed the use of a walker "as tolerated" to assist Claimant in getting around in lieu of the wheelchair. (ECF No. 11 at 597). Claimant continued to use the walker for a period of time in 2017, prior to progressing to the use of a cane or crutch. (*See* ECF No. 11 at 594, 596 and 799). Claimant testified in October 2018 that he used a cane almost daily and had issues getting up or walking around his house without assistance. (ECF No. 11 at 114). Although the Court makes no determination as to how long Claimant's use of an assistive device required the use of both upper extremities, that is but one of the regulation's examples of a person who is unable to ambulate effectively. *See* 20 C.F.R. Pt. 404 Subpt. P App. 1 § 1.00B2b. Accordingly, upon remand, an ALJ could determine that Claimant is unable to "sustain[] reasonable walking pace over a sufficient distance to be able to carry out activities of daily living" and that he does not "have the ability to travel without companion assistance to and from a place of employment[.]" 20 C.F.R. Pt. 404 Subpt. P App. 1 § 1.00B2b.

Accordingly, remand is necessary for the ALJ to examine whether Claimant meets or medically equals a listing.

Because the Court recommends reversal of the Commissioner's decision and remand for further proceedings, Claimant's additional objections may be addressed and rectified on remand. For example, the Court notes that while not reviewing the issue in detail, it certainly appears that the Claimant's credibility was not properly assessed. *See* SSR 16-3p, 2017 WL 5180304, at *4 (The ALJ's credibility determination must be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."); *Schroer v. Comm'r of Soc. Sec.*, 2018 WL 3145846, at *5 (N.D. Ohio June 12, 2018) (remanding because the ALJ's decision failed to meet the articulation requirements of SSR 16-3p).

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court REVERSE the Commissioner of Social Security's nondisability finding and REMAND this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

DATED: January 25, 2021

                                                    *Carmen E. Henderson*
                                                    Carmen E. Henderson
                                                    United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States* v. *Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas* v. *Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).